**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-45 (TNM)** |
| **BRIAN PRELLER** | |
| Defendant. | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brian Preller to 8 months' imprisonment, the low end of the stipulated Sentencing Guidelines range, 3 years of supervised release, a $100 special assessment, and $2,000 in restitution.

## I.     INTRODUCTION

The defendant, Brian Preller, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Preller, and members of his group, known as the "Guardians of Freedom (GoF)," an organization loosely affiliated with the Three Percenters,[2] joined the riot at the Lower West Terrace where he and others entered the Tunnel, which provides direct access to the Capitol. The officers in the Tunnel were under siege for almost two and a half hours from defendants such as Preller. Preller confronted and assisted others in confronting the police officers who were preventing a breach into the Capitol through the Tunnel by adding his force, momentum, and effort to that of other rioters in a "heave-ho" effort, putting intense aggregate pressure on the police line in front of the rioters.

The government recommends that the Court sentence Preller to 8 months' incarceration, which is the low end of the stipulated advisory Guidelines' range of 8-14 months. An 8-month sentence reflects the gravity of Preller's conduct, but also acknowledges his early admission of guilt and his assistance to law enforcement in the investigation of others.

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] According to the website of the Anti-Defamation League:

> Three Percenters are part of the militia movement, which supports the idea of a small number of dedicated "patriots" protecting Americans from government tyranny, just as the patriots of the American Revolution protected early Americans from British tyranny. The Three Percenter concept, created in 2008, is based on an inaccurate historical claim that only three percent of Americans fought in the Revolutionary War against the British. Three Percenters may join or form traditional militia groups but often form non-paramilitary groups or online networks. Many are not associated with any particular groups. The Three Percenter concept both contributed to and benefited from the resurgence of the militia movement that began in 2008.

https://www.adl.org/resources/backgrounder/three-percenters (visited June 22, 2023).

II.     **FACTUAL BACKGROUND**

A.      **The January 6, 2021 Attack on the Capitol**

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 72, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.  **Preller's Role in the January 6, 2021 Attack on the Capitol**

On January 5, 2021, Preller traveled to Washington, D.C. with members of GoF. The group attended the rally that former President Donald Trump held on January 6, 2021. Following the rally, Preller and several other members of the group traveled in a military formation while on restricted grounds of the U.S. Capitol.

Preller wore large goggles and a green helmet with the word "monster" on the back in white. He also wore a green tactical vest that carried what appeared to be a chemical irritant spray in the front. Preller possessed a black walking stick. The phrase "B SQUAD" was printed on the back of his tactical vest armor.

  

**(Left to Right) Image 1A (depicting Preller with chemical irritant and black walking stick on the Lower West Terrace); Image 1B (depicting Preller with the tactical vest denoting "B Squad"; and Image 1C (depicting Preller with black walking stick).**

At approximately 3:08 p.m. on January 6, Preller was present at the Lower West Terrace near the northwest scaffolding. Preller joined a group of rioters who attempted to force their way past the officers responsible for securing the tunnel entrance to the Capitol Building. *See Image 2.*

**Image 2 (showing Preller approaching the Tunnel)**



Preller approached the Tunnel area around 4 p.m. on January 6, 2021. He watched as other rioters attacked police in the Tunnel. Either Preller, or someone standing near Preller, shouted "make a hole," as he moved to the entryway where rioters were fighting police. *See Exhibit A*. As he was moving toward the Tunnel, Preller carried the black walking stick. By approximately 4:15 p.m., Preller was in the Tunnel, holding what appeared to be a can of chemical irritant. Preller gestured with his hand, apparently to someone on the front line. He later put his head down in what appears to be an effort to brace forward. *See Exhibit B, timestamp 4:19 pm -4:20.40 pm*.



**Image 3 (blue arrow showing Preller raising fist as he joins in push against law enforcement in the Tunnel, from Exhibit B at 4:19.21 pm).**

Preller then joined the other rioters in their efforts to push against the line of officers inside the Tunnel. After the rioters, including Preller and members of his group, were pushed out of the Tunnel entrance by the officers, Preller made his way to the west side of the Lower West Terrace. *See Image 4.*

**Image 4 (showing Preller departing the Tunnel)**



Following the riot, Preller posted several statements on social media, taking credit for his actions on January 6, 2021. Specifically, he messaged that he was "building an army of 3% patriots that I'm commanding officer for also connect to the CIA DHS and Q anan." When the other individual asked what the "army," did, Preller responded: "community outreach .. Invade the capitol building…" In July 2021, when an acquaintance asked what Preller was doing, Preller indicated that he was "[c]ontuining to build my 3% army so I can overthrow the federal government." As late as December 2021, he sent an acquaintance a picture of himself under an American flag with the black walking stick, admitting that he was at the U.S. Capitol on January 6.

FBI agents interviewed Preller in August 2022, following his arrest. He admitted his actions on January 6, 2021 at the U.S. Capitol. He also assisted investigators and provided information.

### III.    THE CHARGES AND PLEA AGREEMENT

On February 10, 2023, a federal grand jury returned an indictment charging Preller with five counts, including, 18 U.S.C. § 231, three other felonies and one misdemeanor.   All related to his activities in a restricted area while in possession of deadly and dangerous weapons, specifically, the black walking stick and the chemical irritant. On June 16, 2023, Preller was convicted of 18 U.S.C. § 231, based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Preller now faces sentencing on 18 U.S.C. § 231(a)(3), civil disorder. As noted the plea agreement and the Presentence Report issued by the U.S. Probation Office, Preller faces up to five years imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The U.S. Probation Office calculated Preller's criminal history as category I, which is not disputed. PSR ¶ 89. Accordingly, based on the government's calculation of Preller's total adjusted offense level, after acceptance of responsibility, at 11, Preller's Guidelines imprisonment range is 8 to 14 months' imprisonment. Preller's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Preller's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Preller forced his way to the Lower West Terrace and confronted police officers attempting to hold off rioters in the Tunnel and prevent a further breach of the Capitol. The most important factors to be considered in Preller's case are: (1) his awareness of the possible violence at the Capitol on January 6 is shown by his military style of dress; (3) he saw violence in the Tunnel from a close vantage point, and instead of turning back continued toward the violence – and engaged with police officers in the Tunnel; and (4) he carried chemical irritant spray when he was on U.S. Capitol Grounds; and (5) he posted inflammatory messages including a note about "building an army" to fight the federal government. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Preller's History and Characteristics

Preller does not have a prior criminal history. He has shown remorse for his conduct.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Preller's criminal conduct on January 6 was the epitome of disrespect for the law.

Preller and members of his group came prepared for violence at the Capitol on January 6, 2021. He traveled in military formation with his group, carrying chemical irritant, and tried to force his way past officers who were defending the Tunnel and the Capitol from further breaches.  He engaged with officers in the Tunnel before being expelled. He later boasted of his accomplishments on social media. Preller has, however, provided information to the government, in an attempt to assist the government in the investigation of others. For that reason, the government is recommending a sentence at the low end of the guideline range.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This facts of Preller are similar to those in *United States v. Ryals*, where the defendant was sentenced to a 9-month term of imprisonment for his plea to violating 18 U.S.C. § 231, 21-CR-244 (CKK). Ryals illegally entered through a side door of the U.S. Capitol after observing that the office door was locked, attempted to break down the door using his shoulder, and was then joined by other rioters who broke through the Rotunda and the Crypt.

One of the GoF members who traveled with Preller was Jonathan Rockholt, and who also forced his way to the Tunnel where he confronted police officers. He pleaded guilty to violating 18 U.S.C. §§ 231 and 641. This Court sentenced Rockholt to 5 months' incarceration. *United States v. Rockholt*, 23-CR-104 (TNM).

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Preller must pay $2,000 in restitution, which reflects in part the role Preller played in the riot on January 6.[7] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol caused approximately $2.8 million in damages, a

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD. Preller's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 110.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 8 months incarceration, 3 years supervised release, and restitution of $2,000.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      ____*s/Jennifer Leigh Blackwell*_____
         Jennifer Leigh Blackwell
         Assistant United States Attorney
         United States Attorney's Office
         For the District of Columbia
         Jennifer.blackwell3@usdoj.gov
         D.C. Bar No. 481097